IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2021

# IN RE PRINCEKENYAN F.[1]

**Appeal from the Chancery Court for Lawrence County**
No. 20-19160        Stella L. Hargrove, Judge

_____

## No. M2020-01306-COA-R3-PT

_____

This appeal concerns the termination of a mother's parental rights. The trial court found that seven grounds had been established: abandonment for failure to support; abandonment for failure to visit; abandonment for failure to provide a suitable home; substantial noncompliance with the permanency plan; persistence of conditions; mental incompetence; and failure to manifest an ability and willingness to assume custody. It also found that termination was in the child's best interest for many reasons, including the mother's failure to provide a safe home, maintain regular visitation, pay child support, and resolve her legal, mental health, and substance abuse issues. The mother contends the trial court incorrectly calculated the period relevant to the ground of abandonment, erred by admitting her mental health records into evidence in violation of Tenn. Code Ann. § 24-7-122, and that the evidence failed to meet the clear and convincing evidence standard. Following a thorough review of the record, we have determined that four of the seven grounds for termination as found by the trial court were established by clear and convincing evidence and that termination of the mother's parental rights was clearly and convincingly in the child's best interest. Therefore, we affirm the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which JOHN W. MCCLARTY and ARNOLD B. GOLDIN, JJ., joined.

Teresa Powers Martin, Lawrenceburg, Tennessee, for the appellant, Kiona F.

_____

[1] This court has a policy of protecting the identity of children by initializing the last names of the parties.

Herbert H. Slattery III, Attorney General and Reporter; Amber L. Seymour, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Stacie Odeneal Shultz, guardian ad litem, Lawrenceburg, Tennessee, for the appellee, Prince Kenyan F.

## OPINION

### FACTS AND PROCEDURAL HISTORY

Prince Kenyan D. F. ("the Child") was born to Kiona D. F. ("Mother") in July 2018.[2] Three months later, the Department of Children's Services ("DCS") received a child safety referral from the emergency department at Southern Tennessee Regional Hospital. When DCS investigator Melinda Goolsby arrived, she found Mother in an agitated and paranoid state. Mother believed that an ex-boyfriend was stalking her and holding her family hostage. She insisted that she and the Child would be killed if they left the hospital and demanded Ms. Goolsby contact the Federal Bureau of Investigation and the U.S. Marshalls to place them in protective custody.

Mother explained that she had worked as a prostitute for a period and her ex-boyfriend was "a big-time pimp." She described to Ms. Goolsby a dream in which she realized that the ex-boyfriend was kidnapping girls and taking them to Cuba or Mexico. Mother believed her ex-boyfriend had been following her since she was a teenager and knew "she was telling people about what they are doing."

Mother also told Ms. Goolsby that she had lost her housing in 2016 and placed her two older children with her grandmother. Although Mother obtained new housing in August 2018, she no longer believed her apartment was safe. Mother also thought someone was watching her grandmother's house. Mother said that she tried reporting the situation to local police, but they did not believe her. Instead, Mother was sent to Rolling Hills Hospital for mental health treatment. While she was at Rolling Hills, the Child stayed with his maternal grandmother.

Mother explained that she took the Child to the hospital because she believed he was molested while staying at her mother's house. The hospital staff told her the Child merely had a diaper rash, but Mother refused to accept the explanation and demanded a rape kit. It took several hours to calm Mother down, and the hospital decided to hold Mother for a psychiatric evaluation.

---

[2] Although the style of this case reads "In re PrinceKenyan F.," the Child's birth certificate reads "Prince Kenyan D[.] F[.]" Further, the birth certificate does not list the Child's father, and there is no record of any party filing to establish paternity.

Unable to identify a suitable caretaker for the Child, Ms. Goolsby placed him into state custody. Mother was then re-hospitalized for mental health treatment at Western Mental Health Institute ("WMHI").

I. PERMANENCY PLANS

After taking the Child into custody, DCS filed a dependency and neglect petition in the Lawrence County Juvenile Court and placed the Child into foster care with his great-aunt, Erica F.

Mother was discharged from WMHI in November 2018, at which time DCS developed the Child's first permanency plan with Mother's participation. The permanency plan included several responsibilities for Mother, including completing mental health, parenting, and alcohol and drug assessments and following all recommendations to completion; submitting to and passing random drug screens; obtaining, maintaining, and providing proof of stable housing and income; paying child support; completing "homemaker services" and parenting education; and resolving legal issues and not incurring new charges.

Unfortunately, Mother's path to reunification with the Child was soon beset with problems. In December 2018, Mother was incarcerated in Lawrence County for violating the conditions of her parole.[3] Then, after Mother was released in January 2019, she tested positive for benzodiazepines, methamphetamine, and tetrahydrocannabinol ("THC"). While Mother completed the required alcohol and drug ("A&D") assessment, she did not comply with the resulting recommendation for outpatient therapy.

Still, Mother's circumstances appeared to improve, albeit modestly, in February 2019 when she obtained a job at a pizza restaurant and passed her second drug screen. Later that month, the juvenile court set Mother's child support at $180 per month. The juvenile court also entered an order finding the Child dependent and neglected based on Mother's failure to provide care during her mental health hospitalizations in October 2018 and during her subsequent period of incarceration in December 2018. The court specifically noted that Mother needed to address her mental health issues before the Child could be returned to her custody.

Despite the court's admonition on Mother's mental health, Mother never completed the mental health assessment required by the permanency plan. In fact, Mother denied any mental health problems and admitted that she was not taking the medication prescribed during her stay at WMHI.

---

[3] The underlying conviction for which Mother was on parole is not clear in the record, but it appears to pre-date Mother's mental health hospitalizations.

What little progress Mother seemed to achieve in February 2019 was quickly erased. The following month, Mother refused to complete a random drug screen and admitted to using THC. When DCS visited Mother's residence, several unidentified people were present, and the home smelled like marijuana. And during supervised visits with the Child, Mother spent most of the time criticizing DCS caseworkers. At one point, Mother even threatened to "blow up" the DCS building.

Then, in May 2019, Mother was found guilty in Giles County of several driving offenses and received a six-month suspended sentence. Her criminal behavior continued in July 2019, when Mother was arrested and spent several days incarcerated in Maury County for possession of marijuana and methamphetamine. Around the same time, Mother told DCS that she had moved out of state and would not be returning for a scheduled visit with the Child.

Mother eventually returned to the state but did not contact DCS. In December 2019, a Marshall County court convicted Mother of violating her probation by failing to report. That same month, Mother was charged in Maury County with several more driving offenses and charges of criminal impersonation, falsifying drug test results, and possession of marijuana. Mother later spent ten days in jail for failure to appear.

## II. TERMINATION PROCEEDINGS

DCS filed its Petition to Terminate Parental Rights in early January 2020. At the time, Mother was incarcerated and did not respond. Thus, in February 2020, DCS moved for a default judgment. Mother filed a pro se response, the trial court appointed her an attorney, and the parties agreed to continue DCS's motion.

In a separate pro se letter to the court, Mother asserted that she was still "in grave danger" and "in a hostage situation" and "in fear for [her] life." Mother explained that she "had to relocate out of state with hopes [her] stalker/killer/sniper/or possibly clown could not find [her]." Mother repeated her cryptic allegations about clowns during a child and family team video conference in June 2020, when she accused DCS of ignoring that "clowns fell from the sky" in 2016. During the meeting, Mother stated that she had left the state again, but she refused to give any contact information to her attorney or DCS other than a post office box in Giles County.

When the Petition to Terminate came on for a final hearing on July 13, 2020, Mother's counsel appeared, but Mother did not appear despite being sent multiple notices of the final hearing.[4] Upon DCS's Motion for Default, the court found Mother failed to

---

[4] One week before the final hearing, Mother's attorney moved to withdraw due to Mother's lack of communication and cooperation. In an affidavit, Mother's attorney detailed her unsuccessful efforts to contact Mother. The court denied the Motion to Withdraw, citing the significance of Mother's parental rights.

substantively respond to the pleadings without justification and failed to appear at trial; as a consequence, the court granted a default. Nevertheless, the trial on the Petition to Terminate Mother's parental rights proceeded.

The trial court heard testimony from DCS caseworker Melinda Goolsby, DCS caseworker Dominique McCoy, probation officer Tiffany Hayden, and the Child's foster mother, Erica F. The court also admitted into evidence several documents, including the juvenile court file; Mother's criminal records; and Mother's child support payment history from the Tennessee Department of Human Services. When DCS sought to introduce Mother's mental health records from Rolling Hills Hospital, Mother's attorney objected on the ground that no custodian affidavit was included, and the court marked the records for identification purposes only. At the conclusion of the trial, the court announced that it would be granting the petition to terminate Mother's parental rights.

In its Order of August 14, 2020, the trial court found that DCS proved eight statutory grounds for termination: (1) abandonment for failure to visit; (2) abandonment for failure to support; (3) abandonment for failure to provide a suitable home; (4) substantial noncompliance with the permanency plan; (5) persistence of conditions; (6) mental incompetence; (7) and failure to assume legal and physical custody. The court also found that termination of Mother's rights was in the Child's best interest for many reasons, including Mother's failure to provide a safe home; Mother's failure to maintain regular visitation; Mother's failure to pay child support; and Mother's failure to resolve her legal, mental health, and substance abuse issues.

This appeal followed.

## ISSUES

Mother raises four issues on appeal:

I. Whether the trial court erred in admitting medical records when no notice was provided consistent with notifying the adverse party sixty (60) days prior to trial.

II. Whether the trial court erred in computing the critical period for purposes of establishing abandonment.

III. Whether the trial court erred in finding statutory grounds to terminate the parental rights of Mother by clear and convincing evidence.

IV. Whether the trial court erred in finding the termination of Mother's parental rights was in the Child's best interest.

## STANDARD OF REVIEW

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). "[T]his right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016).

In an appeal, "this court is required 'to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests.'" *In re Connor B.*, 603 S.W.3d 773, 779 (Tenn. Ct. App. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 525). In doing so, we must determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Stated another way, we must make our own "determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

The trial court's findings of fact are reviewed de novo upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d at 523–24; *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). A trial court's determinations regarding witness credibility are entitled to great weight on appeal and will not be disturbed absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

## ANALYSIS

## I. MENTAL HEALTH RECORDS

Mother contends her mental health records from Rolling Hills and WMHI should have been excluded because DCS failed to provide the records to her at least 60 days before trial along with notice that the records may be offered in evidence as required by Tenn. Code Ann. § 24-7-122.[5] The guardian ad litem and DCS contend that Mother waived this issue by not raising it before the trial court. We agree.

We addressed a substantially similar situation in *In re Gracie H.Y.*, No. M2019-00639-COA-R3-PT, 2020 WL 1249453 (Tenn. Ct. App. Mar. 16, 2020), *appeal denied* (June 16, 2020). In *Gracie*, the mother objected to the admittance of medical records at trial for lack of foundation and relevance. *Id*. at *14. But on appeal, the mother objected to the documents' admittance because they were not provided before trial per Tenn. Code Ann. § 24-7-122. *Id*. Because the mother had not raised that ground in her objection during the trial, we found she waived the issue on appeal. *Id*.

Here, Mother objected to admitting her Rolling Hills records in the trial court on the basis that no custodian affidavit was attached.[6] She did not, however, object to the admission of her WMHI records on any grounds. Nevertheless, on appeal, Mother argues that all of her medical records should have been excluded under § 24-7-122. Because Mother did not raise this issue before the trial court, we find she has waived it on appeal. *See In re Gracie*, 2020 WL 1249453, at *14.

## II. GROUNDS FOR TERMINATION

The trial court found DCS proved seven grounds for terminating Mother's parental rights: (1) abandonment by failure to visit; (2) abandonment for failure to support; (3) abandonment for failure to provide a suitable home; (4) substantial noncompliance with the permanency plan; (5) persistence of conditions; (6) mental incompetence; (7) and failure to assume legal and physical custody. Accordingly, we will review the trial court's findings on each ground. *See In re Carrington H.*, 483 S.W.3d at 525–26.

---

[5] Tennessee Code Annotated § 24-7-122 provides in relevant part:

(c) When records or reproductions of records are used at trial pursuant to this section, the party desiring to use the records or reproductions in evidence shall serve the opposing party with a copy of the records or reproductions no later than sixty (60) days before the trial, with notice that the records or reproductions may be offered in evidence, notwithstanding any other rules or statutes to the contrary.

[6] The record before this court reveals that the custodian's affidavit was subsequently filed with the court.

## A. Abandonment

A ground for termination exists if "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred." Tenn. Code Ann. § 36-1-113(g)(1).

The trial court found that DCS established three grounds of abandonment: two under § 36-1-102(1)(A)(i), which defines abandonment as the failure to support or the failure to visit during the four months "immediately preceding the filing of a proceeding, pleading, petition or amended petition for termination of parental rights or adoption"; the other under § 36-1-102(1)(A)(ii), which defines abandonment as the failure to make efforts to provide a suitable home for the child for four months after the child's removal.

Mother contends the trial court incorrectly computed the period for establishing abandonment for failure to visit and abandonment for failure to support under Tenn. Code Ann. § 36-1-102(1)(A)(i). DCS concedes this issue on appeal but asserts that abandonment was proven under the definition in § 36-1-102(1)(A)(ii). Thus, our analysis will be limited to the third ground of abandonment.

Under Tenn. Code Ann. § 36-1-102(1)(A)(ii), abandonment may be proven by showing that the parent failed to make reasonable efforts to provide a suitable home for the child for four months after the child's removal:

> For purposes of terminating the parental or guardian rights of a parent . . . "abandonment" means that:
>
> .   .   .
>
> (ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of [dependency and neglect] proceedings . . . , and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (*b*) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. . . .

"A suitable home 'requires more than a proper physical living location. It requires that the home be free [from] drugs and domestic violence.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (citations omitted). Similarly, matters relating to counseling and assessments are "directly related to the establishment and maintenance of a suitable home." *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009). Further, "[t]he efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c).

The Child was physically removed from Mother on October 16, 2018. The next day, the Child was removed from Mother's legal custody by court order at the beginning of the dependency and neglect proceedings.[7] Thus, the relevant period for this termination ground was October 17, 2018, to February 17, 2019.

The trial court found that DCS made reasonable efforts to assist Mother during the relevant period, but Mother did not make reciprocal efforts to establish a suitable home, and the evidence does not preponderate against this finding. During the trial, Ms. McCoy testified that DCS provided access to several services related to establishing a suitable home, including a mental health assessment, an A&D assessment, and homemaker services. Although Mother completed the A&D evaluation, she did not follow the resulting recommendation to attend outpatient therapy. Mother failed a drug test in January 2019, admitted to using THC in March 2019, and was arrested several times for possession of marijuana and methamphetamine. And although Mother attended one homemaker class, she did not complete the program.

The trial court also found that Mother showed a lack of concern for the Child such that it appeared unlikely Mother could provide a suitable home in the near future, and the evidence does not preponderate against this finding. Ms. McCoy testified that Mother had altogether stopped cooperating with DCS by mid-2019 and moved out of state. When Mother returned, she was incarcerated on several drug-related charges. Moreover, Mother's probation officer, Ms. Hayden, testified that Mother gave her the address for a homeless shelter in Nashville around the same time. The Child's foster mother, Erica F., testified that Mother visited the Child's home on a few occasions in 2020 but gave little attention to the Child.

Based on the above, we affirm the trial court's conclusion that the evidence clearly and convincingly established the ground of abandonment by failure to provide a suitable

---

[7] It is undisputed that the juvenile court found the circumstances of the Child's situation prevented reasonable efforts from being made before the Child's removal.

home under Tenn. Code Ann. § 36-1-102(1)(A)(ii). However, because DCS concedes that abandonment by failure to visit and support was not proven under the definition in § 36-1-102(1)(A)(i), we reverse the trial court's ruling on those grounds.

## B. Substantial Noncompliance with Permanency Plan

Termination of parental rights may also be based on "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2). Noncompliance with the permanency plan may be grounds for termination only "if the court finds the parent was informed of [the plan's] contents, and that the requirements . . . [were] reasonable and [were] related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C); *see also In re Valentine*, 79 S.W.3d at 547. "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. Whether a parent's noncompliance is substantial depends on "the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citations omitted).

DCS developed a permanency plan with the participation of Mother in November 2018. DCS revised the plan three times after that. Each version of the plan identified Mother's mental health hospitalization as the reason for the Child's removal. Although Mother was discharged from the hospital in November 2018, the juvenile court found the Child dependent and neglected in February 2019 because Mother had been incarcerated during December 2018 and January 2019 and still had "mental health needs that need[ed] to be addressed prior to the [C]hild returning to her custody." The Child's DCS caseworker, Ms. McCoy, testified that Mother's mental health treatment and resolution of outstanding legal issues were the most critical to ensure safe reunification with the Child. Thus, the permanency plans required Mother to, *inter alia* (1) complete a psychological assessment and follow all recommendations; (2) provide proof of housing; (3) provide proof of regular income; and (4) "resolve all legal issues and not [incur] any new charges."

Ms. McCoy testified that Mother never completed the psychological assessment, never provided proof of housing or a stable income, and failed to resolve her outstanding legal issues. Mother also continued to incur new criminal charges. Mother's probation officer, Tiffany Hayden, testified that Mother fell behind on her probation fees and an arrest warrant was outstanding at the time of trial because Mother failed to report.

The evidence shows that Mother knew about her responsibilities, the responsibilities were reasonable and related to the conditions that necessitated foster care, and Mother disregarded several requirements of utmost importance to reunification with the Child. Accordingly, we affirm the trial court's ruling that the evidence clearly and convincingly established the ground of substantial noncompliance with the statement of responsibilities in the permanency plan.

## C. Persistence of Conditions

Under Tenn. Code Ann. § 36-1-113(g)(3), parental rights may be terminated when the child has been removed from the parent's custody during dependency and neglect proceedings for six months and three factors exist:

(i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii)   The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home . . . .[8]

The purpose of this ground is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). As the statute prescribes, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, 2008 WL 4613576, at *20). Further, "[w]here . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id*.

The initial reason for the Child's removal was Mother's hospitalization for mental health treatment and the lack of an alternative caregiver. The Child was removed from Mother's custody in October 2018 when DCS filed its dependency and neglect petition in the juvenile court and remained in foster care during the trial, over 18 months later. Thereafter, the juvenile court found the Child dependent and neglected because of Mother's incarceration and continuing mental health needs.

---

[8] Tennessee Code Annotated § 36-1-113(g)(3) requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

Between the time the Child was removed and the trial on the Petition to Terminate Mother's rights, Mother provided no proof of stable income or housing and was incarcerated multiple times. Mother also spent a period living at a homeless shelter. Further, records from the Tennessee Department of Human Services show that Mother paid just over $300 in child support during 2019, despite being ordered to pay $180 per month. And at the time of trial, Mother had an outstanding warrant for her arrest in Lawrence County for violating her probation.

DCS tried to help Mother improve her parenting abilities over a long period. Four permanency plans were entered during this case, three before DCS filed its petition to terminate Mother's parental rights. Each extended the time for Mother to complete her responsibilities, and each provided that DCS would help Mother in various ways, such as obtaining a mental health assessment and access to A&D treatment. DCS arranged for visitation with the Child and transported Mother to the visits. Mother not only failed to seize these opportunities, but she also actively rebuffed DCS by verbally assaulting the personnel charged with helping her and then moving out of state.

The Child's foster mother, Erica F., testified that she was prepared to adopt the Child if the trial court terminated Mother's parental rights and that the Child was thriving in her care.

Based on the above and other facts in the record, the trial court found that the evidence established the first of the three statutory factors, that other conditions existed that, in all reasonable probability, would cause the Child to be subjected to further abuse or neglect, preventing the Child's safe return to Mother's care. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). The trial court also found that the evidence established the second statutory factor, that there was little likelihood the conditions preventing the Child's safe return would be remedied at an early date. *See id.* § 113(g)(3)(A)(ii); *see also In re Dakota C.R.*, 404 S.W.3d at 499 ("Where . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." (quoting *In re A.R.*, 2008 WL 4613576, at *20)). Additionally, the court found the third factor had been established—that continuation of the parent-child relationship between Mother and the Child greatly diminished the Child's chances of early integration into a safe, stable, and permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3)(iii).

The evidence in the record does not preponderate against any of these findings. Moreover, we have concluded, as the trial court did, that DCS proved the ground of persistence of conditions under Tenn. Code Ann. § 36-1-113(g)(3), by clear and convincing evidence. Accordingly, we affirm on this ground.

## D. Mental Incompetence

Under Tenn. Code Ann. § 36-1-113(g)(8)(B), a parent's rights may be terminated if the parent's mental condition is impaired and unlikely to improve:

The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent . . . of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future. . . .

In determining that this ground applied, the trial court relied heavily on medical records from Mother's stay at Rolling Hills and WMHI and Ms. Goolsby's testimony that "Mother refuses to admit she is mentally ill and needs treatment." On appeal, DCS cites evidence of Mother's "long history of involuntary admissions to mental institutions" and Mother's February 2020 letter to the court, in which she described being stalked by a clown. Both Ms. McCoy and Ms. Goolsby testified that Mother's conduct during child and family team meetings was erratic. Ms. Goolsby testified that Mother "was all over the place" and unable "to focus and listen or concentrate on one thing at a time" during the meeting in February 2020 when Mother referenced "clowns [falling] from the sky" in 2016.

While all this evidence is undoubtedly concerning, we find the record lacks the clear and convincing evidence necessary to establish mental incompetence under Tenn. Code Ann. § 36-6-113(g)(8). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *In re Carrington H.*, 483 S.W.3d at 522.

Generally, our courts have found the clear and convincing standard for this ground was met when there was expert testimony about the parent's mental condition and how it would affect the parent's ability to care for the child. *See id*. at 538 (citing testimony by "mental health experts . . . that Mother's impaired mental condition would prevent her from assuming the care and responsibility for [the child] in the near future"); *see also State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008) (citing expert testimony that the father's impairment "was a 'lifelong condition' and that he functioned in such a low range that no amount of training, education, or counseling 'could bring him up to the level where he could parent these children'"); *accord In re Joseph F.*, 492 S.W.3d 690, 705 (Tenn. Ct. App. 2016); *State, Dep't Of Children's Servs. v. Peterson*,

341 S.W.3d 281, 292 (Tenn. Ct. App. 2009); *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004).

Here, the only clinical evidence of Mother's mental condition, which is set forth in the medical records from October 2018, fails to address Mother's parenting abilities.[9] Moreover, and significantly, there is no expert testimony regarding Mother's present mental condition as of the time of trial. This is significant because the statute requires clear and convincing evidence that the parent "is incompetent to adequately provide for the further care and supervision of the child because **the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future**. . . ." Tenn. Code Ann. § 36-1-113(g)(8)(B)(i) (emphasis added). The record before us fails to provide competent evidence of these essential facts.

Thus, DCS did not clearly and convincingly prove that Mother's "mental condition [was] presently so impaired" so as to warrant terminating her parental rights under Tenn. Code Ann. § 36-1-113(g)(8). Accordingly, we reverse the trial court's determination that this ground was proven.

E. Tenn. Code Ann. § 36-1-113(g)(14)

Another ground for termination exists when it is proven by clear and convincing evidence that: (1) the parent failed to manifest either the ability or willingness to personally assume legal and physical custody or financial responsibility of the child, and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Tenn. Code Ann. § 36-1-113(g)(14); *see In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). As is evident from the wording of the statute, there are two essential prongs to this ground, and each prong must be proven for the ground to be established.

"If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d at 677 (emphasis in original) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). The second prong is satisfied if the risk of harm is "a real hazard or danger that is not minor, trivial, or insignificant" and is "more than a theoretical possibility." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001).

The record shows that when Mother was discharged from WMHI, she failed to pursue the steps that DCS laid out for reunification. Rather than try to bolster her capacity

---

[9] We recognize that DCS's ability to prove this ground was hampered by Mother's refusal to attend a mental health assessment. As discussed, however, Mother's failure and outright refusal to cooperate with DCS contributed to other grounds for termination.

to care for the Child, Mother abandoned her efforts to maintain the fundamental elements necessary to care for him. Moreover, according to Erica F. and Ms. McCoy, Mother demonstrated little interest in caring for the Child during visits. Furthermore, it is undisputed that Mother was incarcerated several times after the Child was placed into foster care, and she had an outstanding arrest warrant in Lawrence County at the time of trial for violating her parole.

Based on this and other evidence in the record, the trial court found Mother failed to manifest an ability and willingness to assume custody because she "ha[d] been absent in his life for a lengthy period of time and provided very little in the way of financial or emotional support."

As for the second prong, the trial court found that placing the Child in Mother's custody would pose a risk of substantial harm to the Child's welfare because, *inter alia*, the Child had been with his foster mother since he was three months old. As a consequence, Mother is a near-stranger to the Child. Further, Ms. Goolsby testified that removing the Child from his placement would be "deeply traumatic."[10] She explained that the Child is "very, very bonded" with his foster mother.

We have held that "forcing the child to begin visitation with a near-stranger would make psychological harm sufficiently probable" for the purposes of Tenn. Code Ann. § 36-1-113(g)(14). *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (citations omitted), *appeal denied* (Dec. 10, 2020). We have also held that "placing [a child] with a parent who has not shown the ability and willingness to abide by the law would put them at a substantial risk for harm." *In re Brayden E.*, No. M2020-00622-COA-R3-PT, 2020 WL 7091382, at *5 (Tenn. Ct. App. Dec. 4, 2020).

Following a close review of the record and having made our own determination, we agree with the trial court's findings, which are supported by a preponderance of the evidence and which amount to clear and convincing evidence to establish this ground. Accordingly, we affirm the trial court's ruling on this ground.

In summation, we affirm the trial court's determination that four grounds were established based on clear and convincing evidence, they being the ground of abandonment by failure to provide a suitable home under Tenn. Code Ann. §§ 36-1-102(1)(A)(ii), the ground of substantial noncompliance with the statement of responsibilities in the permanency plan under Tenn. Code Ann. § 36-1-113(g)(2), the ground of persistence of conditions under Tenn. Code Ann. § 36-1-113(g)(3), and the ground of failing to manifest either the ability or willingness to personally assume custody or financial responsibility of the Child under Tenn. Code Ann. § 36-1-113(g)(14). Conversely, we reverse the trial court's determinations that DCS proved the grounds of abandonment by failure to visit,

_____

[10] The trial court found that Ms. Goolsby was qualified to testify as an expert on childhood trauma.

- 15 -

abandonment by failure to support, and that Mother's "mental condition [was] presently so impaired" so as to warrant terminating her parental rights.

In that at least one ground for termination was proven, we shall now conduct the best interest analysis.

## III. BEST INTEREST ANALYSIS

Having determined that DCS proved at least one ground for termination, we next consider whether termination was in the Child's best interest. *See* Tenn. Code Ann. § 36-1-113(c). In *In re Gabriella D.*, the Tennessee Supreme Court summarized the law pertaining to this analysis:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i).[11] These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193–94 (Tenn. Ct. App. 2004). Rather, the facts and

---

[11] Tenn. Code Ann. § 36-1-113(i) has been amended and the best interest factors to be considered have been revised. See Act of April 22, 2021, ch. 190, § 1, 2021 Tenn. Pub. Acts ---- (to be codified as amended at Tenn. Code Ann. § 36-1-113(i)). The amended statute applies to petitions for termination that are filed on or after April 22, 2021; thus, the new factors does not apply to this case.

circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523.

531 S.W.3d 662, 681–82 (Tenn. 2017).

When the trial court entered its order terminating Mother's parental rights, Tenn. Code Ann. § 36-1-113(i) included nine factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The trial court found that all nine factors applied and supported terminating Mother's parental rights. Although we find some of these factors more applicable than others, we agree with the trial court's findings and overall conclusion that termination was in the best interests of the Child.

The trial court found that Mother had not made an adjustment as to make it safe and in the Child's best interest to be in her home because, *inter alia*, Mother was "not drug free, d[id] not have stable housing or income, . . . and continues to engage in criminal behavior." The trial court found Mother had not maintained regular visitation and had no meaningful relationship with the Child based on Erica F.'s testimony that "[m]other's contact was sporadic at best" and that "when Mother comes to family gatherings where the [C]hild is present[,] Mother does not acknowledge [him]."

The trial court also found "changing caregivers at this stage of [the Child's] life will have a detrimental effect on him" based on Ms. Goolsby's testimony "that placing the [C]hild back with [Mother] would cause permanent[,] irreparable harm to the [C]hild." The court noted Erica F.'s testimony that the Child is thriving and has become a part of the family. In contrast, the court found Mother's home was not healthy and safe based on her continued drug use and criminal activity. The trial court also found Mother had not paid support as ordered.

The evidence preponderates in favor of the trial court's findings, and we agree with the trial court's conclusion that the combined weight of the facts and findings amounted to clear and convincing evidence that termination was in the Child's best interests.

**IN CONCLUSION**

Having determined that clear and convincing evidence proves that statutory grounds for termination of Mother's parental rights exist and that termination is in the Child's best interest, *see* Tenn. Code Ann. § 36-1-113(c) and *In re Valentine*, 79 S.W.3d at 546, we affirm the termination of Mother's parental rights.

Costs of appeal are assessed against Mother, Kiona F.

_____
FRANK G. CLEMENT JR., P.J., M.S.

- 18 -